UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )    CRIMINAL ACTION
       v.                           )    NO. 14-04172-DHH
                                    )
JAMES MERRILL,                      )
                                    )
              Defendant.            )
_____ )


**MEMORANDUM OF DECISION ON DEFENDANT JAMES MERRILL'S MOTION TO REVOKE DETENTION ORDER AND FOR PRETRIAL RELEASE (Docket No. 33)**
**June 17, 2014**

HILLMAN, D.J.

## Introduction

On May 9, 2010, a Complaint issued charging James Matthew Merrill ("Merrill" or the "Defendant") with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349. The same day, Merrill appeared before Magistrate Judge David H. Hennessey for his initial appearance, and the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(A) (Defendant is a risk of flight). A detention hearing was held before Magistrate Judge Hennessey on May 16, 2014.

On May 20, 2014 Magistrate Judge Hennessey orally entered an Order of Detention for Merrill after finding that the government had satisfied its burden of proof that no condition or combination of conditions would assure the Defendant's presence. Merrill filed a motion appealing that decision, asking this Court to revoke the detention order imposed by Magistrate Judge Hennessey and to grant Merrill pretrial release with whatever conditions the Court believes necessary. This Court conducted an evidentiary hearing on June 5, 2014 and has

1

independently reviewed Magistrate Judge Hennessey's decision. As this Court finds that government has failed to meet its burden of proof that no condition or combination of conditions would assure the Defendant's presence, Merrill's motion is granted.

**Facts**

This case is part of an investigation by the Department of Homeland Security ("DHS") into a company called TelexFree, Incorporated ("TelexFree"), which started as Common Cents Communications in 2002. TelexFree was owned and run by Merrill and the co-defendant in this case, Carlos Wanzeler ("Wanzeler") (collectively, the "Defendants"). The government alleges that the Defendants operated TelexFree as a pyramid scheme from January 2012 through April 2014. TelexFree is a United States Corporation; it also operated in Brazil through a company called Ympactus which was owned by Merrill, Wanzeler, and another individual named Carlos Costa. TelexFree is also incorporated in Canada under the name TelexFree Canada. The directors of TelexFree Canada are Merrill, Wanzeler, and another individual named William Watson.

TelexFree provided "voice-over-internet-protocol" ("VOIP") telephone services, selling a product known as "99TelexFree" which allowed for unlimited international calling to at least 40 countries for the monthly flat rate of $49.90. The government does not deny that TelexFree is a real company that provided an actual service. Between January 2012 and March 2014, TelexFree marketed its VOIP service by recruiting thousands of "promoters" to sell the VOIP service and to post ads for the product on the internet. A retail customer could purchase the VOIP service either by using a credit card or bank information to purchase the service from a promoter via the TelexFree website or by paying the promoter directly. It is estimated that by March 2014 TelexFree had between 700,000 to over one million promoters around the world, including in Brazil, South America, Europe, Asia, and Russia. One who wished to become a TelexFree

promoter was required to pay a $50 membership. After paying this fee, the individual could buy one of two "AdCentral" packages, priced at $289 and $1,375. At the $289 buy-in level, TelexFree gave the promoter access to ten VOIP products to sell a week. A retail customer could buy one of these VOIP products for $49.90 for the first month. A promoter would receive a 90% commission, or $44.90, out of each such sale, plus an additional 10% commissioner each time the retail customer renewed on a monthly basis.

If the promoter posted one ad a day for seven consecutive days, TelexFree would "buy back" any unsold products for $20. At the $289 buy-in level, a promoter could make $1,040 a year ($20/week for 52 weeks) without selling a single VOIP product, as long as the promoter posted the required advertisements. The $1,375 buy-in level was similarly structured; TelexFree gave the promoter a stock of 50 VOIP products a week and required the promoter to post five ads per day for seven consecutive days. If the promoter did so, TelexFree would "buy back" any unsold product for $100 a week, allowing a promoter to earn $5,200 a year without selling any VOIP product.

TelexFree also compensated promoters for recruiting others to become promoters. To be eligible for such compensation, TelexFree required a promoter to make at least one retail sale of the VOIP product. For each recruit at the $289 buy-in level, TelexFree paid the recruiting promoter $20, and for each recruit at the $1, 375 buy-in level, TelexFree paid the recruiting promoter $100. Promoters could also profit from TelexFree "buying back" product from promoters they had recruited, and from VOIP sales made by promoters they had recruited going six levels deep.

The Brazilian government began investigating TelexFree on or about January 2013. The investigation resulted in a Brazilian civil enforcement action against TelexFree in June 2013, in

which the Brazilian government won an injunction prohibiting TelexFree from recruiting new promoters and from taking in funds or paying money to existing TelexFree promoters. The Brazilian government froze about $350,000,000 in funds belonging to TelexFree. Records from the Brazilian Ministry of the Treasury show that since TelexFree began recruiting promoters in Brazil, TelexFree bank accounts in Brazil had received about $446,000,000 in U.S. dollars.

On October 15, 2013, as part of its investigation in this case, DHS sent an undercover Homeland Security Investigations ("HSI") task force officer ("UC") to meet with a TelexFree promoter ("A"). The next day, UC met with A again and successfully joined TelexFree as a promoter at the $1,375 buy-in level. Beginning October 21, 2013, using the UC's access to the TelexFree system, an HSI Intelligence Research Specialist placed online advertisements as a promoter for TelexFree. The Specialist posted over 700 advertisements, none of which resulted in retail sales of the VOIP product. On November 2, 2013, A told UC that UC did not need to sell TelexFree's VOIP product in order to make money, but could just post ads. In meeting on December 2, 2013, A told UC that since July 2012 he had earned $1,600,000 as a TelexFree promoter without selling a TelexFree product.

In 2013, the Massachusetts Securities Division ("MSD") began investigating TelexFree, including serving TelexFree with demands for various kinds of information about its operations. On April 14, 2014, facing liabilities to its promoters, TelexFree and its related entities filed for voluntary Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Nevada. The next day, April 15, 2014, federal agents executed three search warrants, including at TelexFree's headquarters in Marlborough, Massachusetts.

As part of its investigation, the government has reviewed financial information for TelexFree which TelexFree provided to the MSD and other state regulatory agencies. The

government found several inconsistencies among these submissions, including substantial differences in profit and loss statements. The government has also made an effort to determine the volume of sales of the VOIP product, and has reviewed bank account, credit card merchant, and other third party records as part of this effort. The government found that the vast majority of deposits to TelexFree accounts were buy-in fees from TelexFree promoters. Based on its investigation thus far, the government estimates only about 1% of the hundreds of millions of dollars in revenue TelexFree accumulated over its two years in operation came from revenue sales of the VOIP service, with the rest coming from investment by new promoters. With such an unsustainable structure, TelexFree could not meet its payment obligations to existing promoters without equally large infusions of cash from new promoters. However, Agent Paul Melican, one of the leading HSI agents in this case, testified that the government has not yet been able to determine how much additional revenue came from sales of the VOIP product where retail customers paid recruiters directly, that is, not through banks or credit cards.

TelexFree held conferences to promote the company. It held one such conference in Boston, Massachusetts on March 9, 2014. Members of HSI, some undercover, attended. During this and other conferences, and YouTube video appearances, Merrill, Wanzeler and the other speakers gave the impression that the VOIP product was groundbreaking, selling well, and that those sales were the primary mission of the company. None of the speakers mentioned that the majority of revenue came from new promoters rather than actual product sales. Merrill and Wanzeler traveled to TelexFree events in other countries as well, including events in Brazil, Spain, and the Dominican Republic. Agent Melican, who reviewed videos of some of these conferences and spoke with HSI undercover agents who were present at conferences in Boston and Orlando, Florida, testified that Merrill was greeted with wild cheering from thousands of

people. Hundreds of letters in support of Merrill and Wanzeler were submitted by promoters in connection with a civil enforcement action against TelexFree.

An analysis of financial records shows that by the end of 2013, Merrill had transferred over $3,000,000 from TelexFree accounts to his personal accounts, and that by that point Wanzeler had received over $7,000,000, including a transfer of $3,500,000 in December 2013. The $3,000,000 that Merrill received in December 2013 has been frozen by the government. Agent Melican testified that he did not believe the $3,500,000 Wanzeler received has been frozen. During its investigation, the government identified dozens of bank accounts belonging or related to TelexFree both in the United States and overseas. The United States government executed seizure warrants for 37 accounts related to TelexFree on April 25, 2014. They have identified and frozen a TelexFree account in the United Kingdom which contains roughly $30,000,000. The government has also identified TelexFree accounts in Singapore, St. Vincent, Grenadine, and the Caymans, but does not know how much money is in these accounts and has not frozen these accounts. Agent Melican conceded at the evidentiary hearing held before this court that he does not know with certainty of any international accounts that Merrill has access to, only that TelexFree has international accounts containing unknown sums of money. He testified that the government does not know if Merrill is a signatory to these overseas accounts. Merrill has provided this Court with an affidavit submitted by Stuart MacMillan, who had been hired by TelexFree to serve as interim CEO in December 2013, asserting that Merrill no longer has access to TelexFree facilities or signatory authority over any TelexFree accounts.

On April 15, 2014, the date the search warrants were executed at the TelexFree company office, Wanzeler fled the United States, driving by car into Canada. Phone records show three phone calls between Merrill and Wanzeler on that date, one of which connected. Two days later,

he flew from Canada to Brazil. Wanzeler, who is not a United States citizen, is currently in Brazil. Merrill and Wanzeler have known each other for over twenty years; it was Merrill who supported Wanzeler's application for his green card. In May 2014, the government detained Wanzeler's wife as a material witness when it learned she was attempting to leave the United States on a one-way ticket to Brazil purchased in Brazil. Agent Melican could not point to any behavior by Merrill that suggested he was considering trying or had attempted to flee at any point.

### **The Applicable Standards**

"In reviewing the magistrate judge's detention orders, the court must undertake an independent review, giving her decision such deference as the care and consideration manifested by the magistrate judge warrant." *United States v. Simone*, 317 F. Supp. 2d 38, 42 (D. Mass. 2004) (internal citations omitted). In this case, that deference to Magistrate Judge Hennessey's thoughtful and well reasoned decision is limited because additional evidence was presented to the Court during its own evidentiary hearing by Merrill's new defense counsel. I also note that the original detention hearing was abbreviated with then defense counsel choosing to seriously restrict her cross examination of the government witness.

When asserting the risk of flight as a basis for detention under, "the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure each defendant's appearance at future court proceedings." *United States v. Digiacomo*, 746 F. Supp. 1176, 1180-81 (D. Mass. 1990) (citing *United States v. Vortis*, 785 F.2d 327, 328–29 (D.C.Cir. 1986), cert. denied, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986)). The Court may then detain a person pending trial only if it determines that "no condition or combination of conditions [set forth under 18 U.S.C. § 3142 (b) or (c)] will reasonably assure the appearance of

the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

In making the determination as to whether "any condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and of the community," the Court must consider the following factors:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including:

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and

(4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release….

18 U.S.C. § 3142(g).

## Discussion

### *Nature of the Offense*

Merrill is charged with a serious offense; the government has alleged that he is the President of a company that perpetrated a pyramid scheme so large that, if convicted, Merrill

faces an advisory guideline range of life imprisonment. Merrill argues that the government's estimation of loss is premature, and that he may face a maximum sentence of ten to twenty years. In either case, Merrill is facing a significant period of incarceration if convicted. While Merrill is not charged with a crime of violence or one involving a narcotic drugs, he is alleged to have committed a crime involving deceit and which resulted in the creation of international contacts and ties, including possible access to overseas bank accounts.

*Weight of the Evidence*

Both parties agree that this factor should be given the least weight in this Court's decision. Moreover, it is difficult to determine at such an early stage in a case that involves such complexity and voluminous documentary evidence, much of which the government and defense counsel have yet to investigate, precisely how strong the case against Merrill is. However, it is one of the factors that the Court is required to consider.

The evidence shows that Merrill had a key role in TelexFree, that there is a significant disparity between the revenue generated from the actual sale of the VOIP product versus revenue from promoter buy-in fees, and that it is likely that TelexFree officers made misrepresentations regarding the nature and health of the company. The government does not deny that TelexFree was a real company that sold an actual product, or that it does not yet know exactly how much revenue was generated from sales of the VOIP product. While the weight of the evidence may not yet be overwhelming, the government has presented a strong case against Merrill at this preliminary stage.

Merrill has also submitted evidence suggesting he may be able to raise "advice of counsel" or state of mind defenses to the charge against him. However, the strength of any such defenses is not clear at this time.

*Defendant's History and Characteristics*

Merrill is currently 53 years old. He was born and raised in the Worcester area, and currently resides in Ashland, where he has lived since 1997. He attended college for two years in Massachusetts. He has been married to his wife, Kristen, for 23 years and has three children. One of his children attends college in Massachusetts, one recently graduated high school and will attend college in New Hampshire in the fall, and the third attends Ashland Middle School. Merrill has coached youth sports teams in the community, both for his own and other children, and has attended almost all of his children's sporting events. Merrill's mother still lives in Massachusetts, and four of his five siblings, along with many nieces, nephews, and cousins who he is close with, reside in New England.

Merrill and his family are members of the St. Matthew Parish in Southborough where they regularly attend Mass. Kristen is currently employed by the church as the Director of Religious Education. Both Merrill and his wife are very involved in the Ashland community, attending town meetings and supporting town initiatives. Kristen has also served on the PTO and other school related boards and committees.

Merrill has no criminal record and has never been arrested before this case. Even when he traveled internationally for TelexFree related events, he generally made separate travel arrangements from his associates so he could return to his family as soon as possible. Significantly, Merrill knew in April 2014 that he was the subject of a federal criminal investigation. While the co-defendant in this case left the United States after a search warrant for TelexFree's place of business was executed on April 15, 2014, Merrill did not, nor is there any suggestion that he has attempted to flee.

Merrill and his wife have offered their home, which has equity of approximately $350,000, as security for his release. In addition, Merrill's sister and her husband have offered to pledge their family home, valued at $330,000, and a family friend has offered to post his home on the Cape, valued at $264,000. Merrill has also offered to submit to any conditions set by the Court, including home detention, electronic monitoring, the surrender of his passport, the surrender of his wife's passport, and daily telephone reports to Pretrial Services.

*The Nature and Seriousness of Danger to any Person or the Community*

The government has not argued, nor does this Court find, that the Defendant's release would pose a danger to any person or the community.

*Whether Defendant Poses a Flight Risk*

The government has not proven by a preponderance of the evidence that the conditions described below will not reasonably assure Merrill's appearance in this case. Merrill has demonstrated very strong family and community ties. He has lived in Massachusetts his entire life, his wife is employed in this state, and his children all attend school in New England. Merrill would forfeit not only the home where his wife and children reside, but also the home where his sister's family resides, and the home of a family friend, if he were to flee. Moreover, though he had the opportunity to flee when he first learned about the criminal investigation, Merrill, unlike Wanzeler, has neither tried to flee nor exhibited any behavior suggesting he is preparing to flee.

This Court recognizes that Merrill, if convicted, could face a substantial sentence and that the case against Merrill appears, at this juncture, to be a strong one. Additionally, the government argues that Merrill, unlike many white collar criminals, has both a place to flee to and the means to go there. It is this factor that Magistrate Judge Hennessey's decision to detain Merrill relied most heavily upon. However, this Court finds the government has not been able to

offer enough concrete evidence supporting this argument to overcome the factors discussed above which weigh against Merrill's risk of flight. While the government has identified overseas accounts belonging to TelexFree, it cannot show how much money is in these accounts nor that Merrill is able to access them; in fact the affidavit of TelexFree's interim CEO states that Merrill no longer has signatory authority over any accounts. Moreover, while the government points to Merrill's international network of supporters, it has not offered proof that there are any individuals, with the possible exception of Wanzeler, who would actually help Merrill flee.

As Magistrate Judge Hennessey noted, this is a close case. However, given Merrill's strong family and community ties and the inability of the government to more fully substantiate its contention that Merrill has the international funds and contacts that would allow him to successfully flee the country, this Court finds that Merrill should be released subject to the following conditions.

## **Conditions**

In addition to the standard conditions of release, the release of the Defendant is subject to the following conditions:

(1) The Defendant promises to appear at all proceedings as required and to surrender for service of any sentence imposed.

(2) The Defendant is placed in custody of: Kristen Merrill of Ashland, Massachusetts, who agrees (a) to supervise the Defendant in accordance with all conditions of release, (b) to use every effort to assure the appearance of the Defendant at all scheduled court proceedings, and (c) to notify the court immediately in the event the Defendant violates any conditions of release or disappears.

(3) The Defendant shall:

(a) Report to Pretrial Services in person and/or by telephone (508-929-9940), as directed.

(b) execute a bond in the amount of $900,000 secured by the following designated property:

    (i) The Defendant's home located in Ashland, Massachusetts

    (ii) The home of the Defendant's sister Julie Merrill Wisell and her husband located in Sutton, Massachusetts

    (iii) The property located at 60 Meredith Drive, East Falmouth, Massachusetts held in trust by Michael Mitchell

(c) post with the court the following indicia of ownership of the above-described property: documentation as set forth in "Recommended Procedure for the Posting of Real Property as Security for Defendant's Appearance Bond in Criminal Cases"

(d) surrender passport to Pretrial Services.

(e) obtain no passport or international travel documents of any kind.

(f) not leave the Commonwealth of Massachusetts without the prior approval of the Pretrial Services Office.

(g) maintain residence in Ashland, Massachusetts.

(h) avoid all contact directly or indirectly, with any persons who are or who may become a victim or potential witness in the subject investigation or prosecution and any co-conspirators.

(i) refrain from possessing a firearm, destructive device, or other dangerous weapons.

(j) refrain from the excessive use of alcohol

(k) refrain from the use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

(l) submit to any method of testing required by the Pretrial Services Officer for determining whether the defendant is using a prohibited substance. Such methods may be used with random frequency and include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing.

(m) participate in a home confinement program and abide by all the requirements of the program including wearing an electronic monitoring bracelet at all times: Defendant shall be restricted to his residence every day from 8:00 pm to 8:00 am.

(n) refrain from obstructing or attempting to obstruct/tamper in any fashion, with the efficiency and accuracy of any testing or electronic monitoring which is required as a condition of release.

(4) The Defendant's wife and children must agree to surrender their passports and agree not to seek new passports or international travel documents without prior written approval of the Court.

## **Conclusion**

For the foregoing reasons, Defendant's Motion to Revoke the Detention Order and for Pretrial Release is ***granted***. This case is remanded to Magistrate Judge Hennessey to issue an order consistent with this opinion.

SO ORDERED.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**